United States District Court
Southern District of Texas
FILED

APR 07 2022

Nathan Ochsner, Clerk

United States District Court
Southern District of Texas

**ENTERED**
April 08, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| RICARDO VILLALON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 7:20-CV-0264 |
| | § | |
| CITY OF MCALLEN, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

Plaintiff RICARDO VILLALON, proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983 against the City of McAllen (the "City"). Plaintiff was shot in the head by an armed civilian, a Michael Garza ("Garza"), whose home Plaintiff was attempting to burglarize on Christmas Eve 2018. His pro se pleadings liberally construed, *see Haines v. Kerner*, 404 U.S. 519 (1972), Plaintiff seeks redress for the violation of his rights under the Fourteenth Amendment's Due Process Clause insofar as the officer from the McAllen Police Department (the "MPD") who responded to the scene, Edgar Devora ("Officer Devora"), failed to prevent the shooting.

The City has now filed a Motion to Dismiss (Dkt. No. 30) for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the basis that Plaintiff has not raised allegations as to the application of the *Monell* doctrine, that is, to allege that he suffered the ostensible constitutional injury as the result of a municipal policy, practice, or custom. (*Id.* at 7-12). The City also argues that it had no duty to protect Plaintiff from private harm insofar as they were not in a "special relationship" occasioned by restraints on Plaintiff's liberty mirroring those of formal arrest. (*Id.* at 15-18). Plaintiff has not filed a response within the timeframe for doing so. The Motion to Dismiss is now ripe for consideration.

This case was referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1). After review of the briefing, the record, and the applicable law, the Magistrate Judge RECOMMENDS that the Motion to Dismiss (Dkt. No. 30) be GRANTED insofar as Plaintiff fails to state a claim absent any *Monell* allegations and sufficient allegations of a "special relationship" with Officer Devora or the City. Also pending is the City's Motion for Entry of Order Granting the Motion to Dismiss (Dkt. No. 35), which the Magistrate Judge RECOMMENDS be DENIED AS MOOT. Accordingly, the Magistrate Judge further RECOMMENDS that this case be DISMISSED and that this case be closed.

## I. BACKGROUND

When he brought this action, Plaintiff was in the custody of the Texas Department of Criminal Justice, Criminal Institutions Division, at the Dominguez Unit in San Antonio, Texas, serving a sentence of imprisonment. (Dkt. No. 1 at 6). The sentence was on a conviction for burglary of a habitation.[1] All indications are that the burglary conviction stemmed from the same burglary at the center of this case.

Plaintiff's complaint was received and filed on September 9, 2020 and opened as a civil action upon Plaintiff's payment of the full filing fee.

Through the complaint, Plaintiff raised a failure-to-protect claim pursuant to § 1983. (Dkt. No. 1 at 4). Only the MPD was named as a defendant. (*Id.* at 3). In terms of relief, Plaintiff requested monetary damages in the amount of $150,000.[2] (*Id.* at 4).

---

[1] Plaintiff's criminal case records can be accessed by using his name to query the Hidalgo County Records Inquiry page at https://pa.co.hidalgo.tx.us/default.aspx.

[2] Plaintiff also sought injunctive relief in the form of release from confinement. (Dkt. No. 1 at 4). Relief from confinement, however, cannot be properly addressed through a § 1983 lawsuit. A challenge as to the fact or duration of a state prisoner's confinement is generally construed as an application for writ of habeas corpus under 28 U.S.C. § 2254. *Caldwell v. Line*, 679 F.2d 494, 496 (5th Cir. 1982). Therefore, the

On November 16, 2020, Plaintiff was ordered to provide a more definite statement in the form of written responses to questions regarding the facts underlying his claim.[3] (Dkt. No. 3).

Plaintiff submitted timely responses to the questionnaire in accordance with the order. (Dkt. No. 6).

On July 21, 2021, Plaintiff was ordered to show good cause why the Magistrate Judge should not recommend that this case be dismissed for failure to state a claim on which relief may be granted. (Dkt. No. 12). Through that order, the Magistrate Judge noted that a failure-to-protect claim like Plaintiff's generally requires a "special relationship" with police formed by way of arrest. (*Id.* at 3-8). The facts as pleaded by Plaintiff, however, suggested that he was subject to only an investigative detention when the shooting occurred. (*Id.* at 8-10).

Plaintiff filed the ordered briefing combined with an amended complaint (Dkt. Nos. 17, 18), as well as a motion to amend the complaint (Dkt. Nos. 16, 19).[4]

On January 7, 2022, the Magistrate Judge granted the motion to amend, noting that Plaintiff's amended complaint merely added factual detail and clarified the legal theories behind his § 1983 claim. (Dkt. No. 27).

Through a contemporaneous order, the Magistrate Judge granted a prior motion by Plaintiff for service of process by the U.S. Marshal. (Dkt. No. 28). In granting that motion, the Magistrate

---

injunctive relief sought by Plaintiff here should not be considered. Regardless, as discussed further below, Plaintiff has recently been released from confinement.

[3] A hearing pursuant to *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985) or a questionnaire pursuant to *Watson v. Ault*, 525 F.2d 886 (5th Cir. 1976) may be employed to develop the factual and legal bases of a prisoner's claims, *see Wesson v. Oglesby*, 910 F.2d 278, 281 (5th Cir. 1990), which procedures are similar to obtaining a more definite statement under Rule 12(e) of the Federal Rules of Civil Procedure, *see Wilson v. Barrientos*, 926 F.2d 480, 482 (5th Cir. 1991).

[4] Plaintiff's combined briefing and amended complaint appears in the record as two handwritten documents. (*See* Dkt. Nos. 17, 18). These documents are identical in content, though they are seemingly transcribed by different hands. (*See id.*). The same is true for the motion to amend. (*See* Dkt. Nos. 16, 19).

Judge ruled that Plaintiff was properly understood to request service, not on the MPD, but the City as the proper defendant.[5] (*Id.* at 1-2). Through the order for service, the Magistrate Judge set out a summary of Plaintiff's factual allegations and advised the City to consider the same in fashioning its responsive pleading. (*Id.* at 2-4). The summary of Plaintiff's factual allegations is set out in the next section of this report.

On January 27, 2022, the City filed the Motion to Dismiss. (Dkt. No. 30). Through the included Certificate of Service, the City indicated that a copy of the motion was served on Plaintiff by mail at the "unit address on the envelopes as required by the Texas Department of Criminal Justice, as listed on his last live pleading." (*Id.* at 19). This attempt at service, however, failed to consider that Plaintiff, on January 3rd, had filed a notice stating that he had been released from prison and was now living at a local residential address. (*See* Dkt. No. 26).

The day after the Motion to Dismiss was filed, the Magistrate Judge issued an order and advisory whereby the Clerk of Court was directed to forward a copy of the motion to Plaintiff at his updated address. (Dkt. No. 31 at 1-2). The Magistrate Judge also advised Plaintiff that, according to local rule, any response to an opposed motion is generally due within 21 days from the filing of the motion. (*Id.* at 1). Plaintiff was further advised that failure to respond is taken as a representation of non-opposition. (*Id.*). Plaintiff was served with these documents at his updated address on February 1st. (Dkt. Nos. 33, 34).

More than 21 days have elapsed since the filing and service of the Motion to Dismiss, but Plaintiff has not responded.

On March 30, 2022, noting Plaintiff's failure to respond, the City filed its Motion for Entry of Order Granting the Motion to Dismiss. (Dkt. No. 35).

---

[5] A police department is not generally considered its own jural entity having an independent existence from a home-rule municipality. *See Darby v. Pasadena Police Dept.*, 939 F.2d 311, 313-14 (5th Cir. 1991).

## II. FACTUAL ALLEGATIONS

Plaintiff alleges through the original complaint in full as follows:

> On Dec. 24, 2018, in McAllen[, Texas], I was fleeing the scene of a crime (burglary) when an officer of [the MPD] showed up. The owner of the house [involved in the burglary] began to chase me down the street armed with a firearm. Instead of the officer stopping and disarming the civilian[,] [the officer] began to chase me. Yards from the civilian['s] home[,] I was on the ground and [the] civilian placed his gun to the back of my head. Once again, instead of disarming [the] civilian, [the] officer proceeded to arrest me. At the last moment the officer moved into the line of fire as [the] civilian shot [his firearm], striking me in the back of [my] head.

(Dkt. No. 1 at 4).

Through the order for more definite statement, Plaintiff was posed questions meant to elicit factual details relating to matters such as the following: (i) the nature of any statements made by Officer Devora to Plaintiff or Garza; (ii) how it was Plaintiff came to the ground; (iii) what Officer Devora was doing when Garza discharged the firearm; and (iv) when Plaintiff was placed under formal arrest or custody. (Dkt. No. 3 at 1-2).

Claiming he suffered a concussion from the shooting, Plaintiff professed a lack of memory as to several of these matters. (Dkt. No. 6 at 1-4). For example, Plaintiff could not recall Officer Devora making any statements, nor could he recall how it was that he ended up on the ground. (*Id.* at 1-3). Plaintiff did clarify, however, that Officer Devora caught up on foot "only moments" thereafter. (*Id.* at 2). Officer Devora was physically on top of Plaintiff's left side, and Plaintiff's hands were behind his back, although he was not in handcuffs, when he heard the gunshot. (*Id.* at 2-3). After the gunshot, Plaintiff came to as he was being placed in a patrol car for transport to the hospital. (*Id.* at 2). Plaintiff further clarified that he was not read his Miranda rights before the shooting. (*Id.* at 3). It was not until he was taken to the police department, upon release from the hospital, that Plaintiff was advised he was under arrest for the burglary. (*Id.*).

Through his amended complaint, Plaintiff referred to factual details of the incident as reported by a recent article in a local newspaper.[6] (*See* Dkt. No. 18 at 2). These details are mostly consistent with Plaintiff's prior allegations. The article identifies Officer Devora and Garza by name. (*Id.*). According to the article, "[w]hen [Officer Devora] arrived [at the scene of the burglary], [Garza] was struggling with [Plaintiff] . . . ." (*Id.*). The article then cites a police news release as stating that "Garza chased [Plaintiff] for several blocks into an open field where [Officer Devora] joined in the pursuit[,]" and "[a]s [Officer Devora] struggled with [Plaintiff], Garza pulled out a handgun and fired in their direction, hitting Devora in the wrist." (*Id.*). Plaintiff seemingly takes issue with the timing of Garza's display of the firearm insofar as he claims that this occurred during the chase, upon which "Officer Devora continued to run after [Plaintiff] with Garza." (*Id.*). Plaintiff adds that "when [Garza] move[d] to shoot [Plaintiff] in the back of the head[,] [Officer Devora] tried to keep [Plaintiff] from being kill[ed][,]" and "[t]he bullet hit [Plaintiff] in the back of [his] head[,] leaving [him] unconscious." (*Id.*).

Piecing together these sources, and giving Plaintiff every benefit of a doubt where the sources happen to conflict, the relevant factual allegations can be summarized as follows:

> Plaintiff attempted to burglarize Garza's home. Someone reported the break in to the MPD, and Officer Devora proceeded to the scene. When Officer Devora arrived, Garza and Plaintiff were in the middle of a physical struggle. Plaintiff broke free and ran on foot down the street. Garza gave chase, and Officer Devora joined in. At some point during the chase, Garza pulled a gun, and Officer Devora continued to run behind Garza after Plaintiff.
>
> After several blocks, Plaintiff made his way to an open field, where he somehow fell onto the ground. Garza caught up to Plaintiff, followed momentarily by Officer Devora. Officer Devora alighted on top of Plaintiff's left side and held Plaintiff's hands behind his back. In that moment, Garza moved to fire, putting the end of the barrel of his gun to the back of Plaintiff's head. As Garza did so, Officer Devora

---

[6] The article, *Fired McAllen Police Officer Shot in Line of Duty Sues City; Claims Medical Mismanagement*, appeared in *The Monitor* on May 22, 2021 and is available at https://myrgv.com/featured/2021/05/22/fired-mcallen-police-officer-shot-in-line-of-duty-sues-city-claims-medical-mismanagement/ (last visited Feb. 22, 2022).

sent out his arm to prevent Plaintiff from being shot. The gun went off, however, and the bullet ricocheted off Officer Devora's wrist and struck Plaintiff in the back of the head, rendering him unconscious.

Plaintiff came to as he was being put in a patrol car for transport to the hospital. Upon release from the hospital, Plaintiff was taken to an MPD station. That is when he was advised that he was under arrest for the burglary.

Plaintiff was not placed in handcuffs, nor was he read his Miranda rights or otherwise advised that he was under arrest, at any point before the gunshot.

(*See* Dkt. No. 1 at 4; *see also* Dkt. No. 6 at 1-4; Dkt. No. 18 at 2).

### III. LEGAL STANDARDS

#### A. Rules 12(b)(6) Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss the plaintiff's claim for the "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Surviving such a motion means pleading "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible where the factual allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Indeed, "[a] merely 'speculative' inference is not enough, and [to be] ignore[d] [are] the complaint's legal conclusions in determining facial plausibility." *Ghedi v. Mayorkas*, 16 F.4th 456, 463 (5th Cir. 2021) (citing *Twombly*, 550 U.S. at 555). On a Rule 12(b)(6) motion, all well-pleaded facts are accepted as true and viewed in favor of the plaintiff. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

#### B. Municipal Liability Under § 1983

The § 1983 statute "creates a private right of action for redressing violations of federal law by those acting under color of state law." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). The violation of law must involve the deprivation of rights or privileges secured

by federal statute or constitutional norms. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994). To act under the color of law means to act under the "pretense" of law. *Screws v. United States*, 325 U.S. 91, 111 (1945). A municipality, meaning a local government below the state level, qualifies as a person liable to suit. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663, 690 (1978).

Under the Supreme Court's *Monell* decision, municipal liability may not be based on the doctrine of respondeat superior. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)). "[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Id.* at 578. In other words, there must be both municipal culpability and causation. *Id.* at 578 n.17. The official action may come by way of an official policy or custom attributable to an official policymaker. *Id.* at 578.

Therefore, municipal liability consists of three elements: (i) an official policy or custom; (ii) a policymaker who can be charged with actual or constructive knowledge of the policy or custom; and (iii) a violation of constitutional rights whose "moving force" is the policy or custom. *Cano v. Harlandale Indep. Sch. Dist.*, 2020 WL 7385843, at *5 (W.D. Tex. Dec. 16, 2020) (citing *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2015)).

An official policy includes the following: (i) a policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; and (ii) a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly

represents municipal policy. *Brown v. Bryan Cnty.*, 219 F.3d 450, 457 (5th Cir. 2000) (quoting *Bennet v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (en banc)) (quotations omitted).

"Though [a plaintiff] need not offer proof of [their] allegations at [the pleadings] stage, [they] must still plead facts that plausibly support each element of § 1983 municipal liability[.]" *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018) (citing *Iqbal*, 556 U.S. at 678). Where a plaintiff fails to offer even a boilerplate allegation of an unconstitutional policy or custom, their complaint is subject to dismissal. *See Minor v. Miss. Dep't of Pub. Safety*, 2020 WL 1877798, at *2 (N.D. Miss. April 15, 2020). Insofar as a policy or custom is alleged, "[t]he description of [that] policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts." *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997).

### C. Duty to Protect

The Due Process Clause of the Fourteenth Amendment provides in relevant part that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Among the substantive rights afforded by the Due Process Clause is the right to be free from unjustified intrusions on personal security. *Ingraham v. Wright*, 430 U.S. 651, 673 (1977). This right may be violated through the infliction of state-occasioned bodily harm. *See generally DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989).

While "[t]here is a recognized substantive due process right for individuals to be free from bodily harm caused by the state, [ ] as a general rule, there is no constitutional duty that requires state officials to protect persons from private harms." *Kovacic v. Villareal*, 628 F.3d 209, 213 (5th Cir. 2010) (citing *DeShaney*, 489 U.S. at 196-97). In other words, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process

Clause." *DeShaney*, 489 U.S. at 197. The purpose of the Due Process Clause "was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196. In line with this principle, the clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* Insofar as the state is not required to provide protective services to its citizens, it follows then that the state cannot be held liable for injuries that could have been averted had the state chosen to provide those services. *Id.* at 196-97.

1. "Special relationship" exception

The general limitation on the state's duty to protect is, however, subject to exception. Well-recognized is the "special relationship" exception, which provides that the state must protect an individual from harm, including, in certain circumstances, private violence, where the restraint renders the individual unable to care for themselves. *McClendon v. City of Columbia*, 305 F.3d 314, 324 (5th Cir. 2002) (per curiam) (citing *DeShaney*, 489 U.S. at 200). The scope of this exception is narrow, such that the Fifth Circuit has extended it to circumstances involving only incarcerated prisoners, individuals involuntarily committed to institutions, or children in foster care. *Brownlee v. Miss. Dep't of Pub. Safety*, 2020 WL 5517677, at *9 (N.D. Miss. Sept. 14, 2020) (citing *Doe v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 855-56 (5th Cir. 2012)); *see also McClendon*, 305 F.3d at 324 (recognizing a special relationship "[w]hen the state, through the affirmative exercise of its powers, acts to restrain an individual's freedom to act on his own behalf 'through incarceration, institutionalization, or other similar restraint of personal liberty'" (quoting *DeShaney*, 489 U.S. at 200)).

"This duty to protect does not arise from the state's knowledge of the individual's predicament or its expression of intent to help, but rather from the limits the state imposes on an

individual's ability to act on his own behalf." *Kingsmill v. Szewczak*, 117 F. Supp. 3d 657, 663 (E.D. Pa. 2015) (citing *Morrow v. Balaski*, 719 F.3d 160, 168 (3d Cir. 2013)).

2. <u>Custodial detention required</u>

"The hallmark of a special relationship is custody: 'full time severe and continuous state restriction of liberty.'" *Kingsmill*, 117 F. Supp. 3d at 663 (quoting *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1371 (3d Cir. 1992)). It is "only when the state, by its affirmative exercise of power, *has custody over an individual involuntarily or against his will* does a 'special relationship' exist between the individual and the state." *Walton v. Alexander*, 44 F.3d 1297, 1303 (5th Cir.1995) (en banc) (emphasis altered). Accordingly, not all encounters with the state, including a municipality's police officers, will amount to the custody necessary to give rise to a special relationship.

There are three types of police/citizen encounters: (i) those involving no coercion or detention; (ii) investigative "seizures," or *Terry* stops, that must be supported by reasonable suspicion; and (iii) full-scale arrests that must be supported by probable cause. *Moore v. LaSalle Corr., Inc.*, 2018 WL 2294220, at *3 (W.D. La. May 3, 2018) (citing *United States v. Berry*, 670 F.2d 583, 591 (5th Cir. 1982)), *report and recommendation adopted*, 2018 WL 2292760 (W.D. La. May 18, 2018).

Some courts have held that a person subject to arrest has a special relationship with the state. *See id.* (citing *Nerren v. Livingston Police Dep't*, 86 F.3d 469, 472-73 (5th Cir. 1996) ("After the initial incidents of a seizure have concluded and an individual is being detained by police officials but has yet to be booked, an arrestee's right to medical attention, like that of a pretrial detainee, derives from the Fourteenth Amendment.")). An encounter with police constitutes an "arrest" where "a reasonable person in the suspect's position would understand the situation to be

a restraint on freedom of the kind that the law typically associates with a formal arrest." *Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007). This depends on the totality of the circumstances. *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam). Circumstances associated with formal arrest include physical contact, *see United States v. Zapata*, 18 F.3d 971, 977 n.4 (1st Cir. 1994), handcuffing, *see United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004), an unjustifiably lengthy detention, *see United States v. Sharpe*, 470 U.S. 675, 682-88 (1985), being placed in a patrol car, *see United States v. Bradshaw*, 102 F.3d 204, 212 (6th Cir. 1996), being given Miranda warnings, *see United States v. Montgomery*, 377 F.3d 582, 588 (6th Cir. 2004), and transportation to a police station for questioning, *see Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (per curiam).

On the other hand, neither a consensual encounter with police nor a *Terry* stop will give rise to a special relationship due precisely to the lack of custody. *See Moore*, 2018 WL 2294220, at *3 (citing *United States v. Galberth*, 846 F.2d 983, 994 (5th Cir. 1988)) (facts alleged did not show that mentally ill person had an Eighth Amendment right to medical care arising from traffic stop because encounter was at most a *Terry* stop and not a custodial arrest).

3. <u>Physical contact and de facto arrest</u>

While physical contact is a factor associated with formal arrest, *see Zapata*, 18 F.3d at 977 n.4, physical contact of itself does not necessarily equate with arrest, *see United States v. Maguire*, 359 F.3d 71, 78 (1st Cir. 2004) (citing *Zapata*, 18 F.3d at 976). A de facto arrest is not implied, for example, where a suspect is restrained on the ground for a security frisk. *See United States v. De La Cruz*, 2017 WL 8950435, at *9 & n.4 (D.P.R. Jan. 20, 2017) (citing *Maguire*, 359 F.3d at 78), *report and recommendation adopted*, 252 F. Supp. 3d 116 (D.P.R. 2017); *see also United States v. Jordan*, 232 F.3d 447, 449-50 (5th Cir. 2000) (holding that pat down and handcuffing of suspect did not automatically convert investigatory detention into arrest). Even the "aggressive

physical touching" involved in taking a suspect to the ground can be insufficient to effect a de facto arrest absent other factors, such as relocating the suspect to a private area for interrogation. *See Patel v. City of Madison*, 2018 WL 1881326, at *22 (N.D. Ala. Apr. 19, 2018).

As the Fifth Circuit has recognized, "using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do not automatically convert an investigatory detention into an arrest . . . ." *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993). The relevant inquiry is whether the force used was reasonably necessary under the circumstances, which requires consideration of whether, at some point during the encounter, the suspect threated the status quo of the investigation or the safety of the officers. *See United States v. Hensley*, 469 U.S. 221, 235 (1985). Non-lethal force during a *Terry* stop may be justified following a suspect's flight or where the suspect's demeanor suggests they may flee. *See Sharpe*, 470 U.S. at 678, 687-88 (armed approach reasonable where suspect attempted to elude a traffic stop); *see also United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) (handcuffs reasonable where suspect's nervous demeanor suggested a flight risk); *United States v. Purry*, 545 F.2d 217, 220 (D.C. Cir. 1976) (handcuffs reasonable after suspect attempted to flee from crime scene).

4. Case examples

In *Kingsmill v. Szewczak* a police officer observed two individuals, Kingsmill and Brown, in a physical altercation from twenty feet away. 117 F. Supp. 3d at 661. The officer called over Kingsmill, who complied. *Id.* While Kingsmill stood speaking to the officer, Brown came up from behind and struck Kingsmill with a pipe. *Id.* Despite having the opportunity to do so, the officer did not warn Kingsmill, nor did he intervene to stop the attack. *Id.* The officer also did not order Brown to stop. *Id.* Kingsmill sued the officer under § 1983, arguing that the officer "seized"

him by calling him over to the patrol car, thereby limiting his ability to protect himself and creating a duty to protect. *Id.* at 663. But the district court held that Kingsmill had no special relationship with the officer because he was not placed in an "involuntary and comprehensive" form of custody. *Id.* at 664. The fact that "Kingsmill complied with [the police officer's] order," the court reasoned, "bel[ied] the involuntary nature of his alleged custody." *Id.* What the *Kingsmill* court deemed "more salient," however, was that the alleged custody was not comprehensive in nature: Kingsmill "was merely standing on the street outside [the police officer's] patrol car as the result of the officer's hail—not incarcerated, involuntarily committed, or similarly precluded from leaving or fending for himself." *Id.*

The case of *Forrester v. Stanley* involved a situation where an officer commanded his police dog to "apprehend" one of the plaintiff's fellow passengers during a traffic stop. 2010 WL 1257471, at *1 (M.D. Fla. Mar. 29, 2010). The command resulted in an attack on the plaintiff as he lay prone in compliance with police orders. *Id.* The plaintiff took the position that a special relationship existed because he was in custody and unable to protect himself. *Id.* at *3. Although the *Forrester* court agreed that the plaintiff had been "seized" under the Fourth Amendment by lying prone pursuant to police order, it held that the seizure, which fell short of an arrest, was not the kind of "custody" for which the duty to protect arises. *Id.* As in *Kingsmill*, the *Forrester* court concluded that the individual's liberty must be so restrained as to render them unable to provide their own basic human needs like food, clothing, shelter, medical care, and reasonable safety.[7] *Id.* (citing *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1175 (7th Cir. 1997)).

---

[7] Otherwise, the *Forrester* court held the police officer was entitled to qualified immunity insofar as there was no clearly established law that his alleged actions violated the plaintiff's Fourteenth Amendment right to protection from physical harm. 2010 WL 1257471, at *3-6. The Eleventh Circuit affirmed, holding in part that it was not clearly established that a *Terry* stop triggers the Fourteenth Amendment's affirmative duty of protection. *Forrester v. Stanley*, 394 F. App'x 673, 675-76 (11th Cir. 2010) (per curiam).

14 / 18

## IV. ANALYSIS

Plaintiff fails to allege that any constitutional injury he may have sustained was connected in any way to a municipal policy, practice, or custom, which failure is fatal to his claim against the City. *See Minor*, 2020 WL 1877798, at *2. Generally, a district court should not dismiss an action for failure to state a claim without giving a pro se plaintiff the opportunity to amend. *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir.1998) (per curiam). But where "a claim is frivolous or the 'complaint alleges the plaintiff's best case,' a further factual statement from the plaintiff need not be allowed." *Whiddon v. Chase Home Fin., LLC*, 666 F. Supp. 2d 681, 692 (E.D. Tex. 2009) (quoting *Jones v. Greninger*, 188 F.3d 322, 327 (5th Cir. 1999)). A plaintiff may be understood to have pleaded their best case where, as here, they offer no response to the defendant's Rule 12(b)(6) challenge. *See Bueno Invs., Inc. v. Depositors Ins. Co.*, 2016 WL 1621619, at *3 (W.D. Tex. April 4, 2016) (collecting cases).

That said, even if Plaintiff were inclined to attempt to remedy his *Monell*-related pleading deficiency, giving him the opportunity to do so would be futile considering that he has already amended the complaint to plead his best case as to a "special relationship" with Officer Devora or the City but has failed to sufficiently allege the same.

It can be assumed that Plaintiff was involuntarily seized when Officer Devora alighted on him as he lay on the ground. But a mere "seizure" akin to a *Terry* stop does not give rise to the special relationship necessary to trigger the state's duty to protect. Again, a special relationship requires a more comprehensive kind of custody, and the nature of the custody associated with an arrest may be theoretically comprehensive enough to form a special relationship.

Here, given the apparently dynamic nature of the circumstances, Plaintiff was not under de facto arrest the moment at which Garza fired his weapon. When Officer Devora arrived on the

scene, he witnessed Plaintiff and Garza in an altercation. The fact that Plaintiff was being chased by Garza supported reasonable suspicion to believe that Plaintiff was the burglary suspect,[8] and further investigation by Officer Devora was clearly in order. To even begin to investigate, Officer Devora had to first attempt to maintain some sort of status quo—a matter complicated by Plaintiff insofar as he continued to run from the scene after Officer Devora joined the chase. The opportunity came when Plaintiff tripped and fell seemingly on his own. Officer Devora quickly alighted on Plaintiff and tried to restrain him. But before there was time enough for Officer Devora to even begin his investigation—and this technical seizure to develop into something resembling a formal arrest—Garza had shot Plaintiff.

Any physical contact by Officer Devora was exceedingly brief, occurring near contemporaneous to when Plaintiff was shot. Plaintiff makes clear that he was not in handcuffs, that he had not been read his Miranda rights, and that the seizure occurred in a residential neighborhood, or in public as opposed to a police station. Officer Devora is *not* alleged to have announced that Plaintiff was under arrest either while giving chase or while Plaintiff was on the ground. It was not until *after* the shooting—and medical aid had been rendered—that Plaintiff was taken to the police department and informed he was to be arrested. Insofar as Officer Devora used force in alighting on Plaintiff, such force was reasonably necessary to maintain the status quo. Again, further investigation of the situation was in order, and Plaintiff posed a flight risk. Given these circumstances, Plaintiff's physical detention by Officer Devora occurring in the moments prior to when Garza discharged his firearm did not exceed the scope of a mere *Terry* stop.

---

[8] *See Walker v. Thaler*, 2012 WL 7749068, at *4 (N.D. Tex. May 9, 2012) (reasonable suspicion for investigatory detention where police officer responded to robbery call and person at the scene pointed to the suspect running away), *report and recommendation adopted*, 2013 WL 1091238 (N.D. Tex. Mar. 15, 2013), *rev'd and remanded sub nom. on other grounds by Walker v. Stephens*, 583 F. App'x 402 (5th Cir. 2014) (per curiam).

Plaintiff's arguments in support of his failure-to-protect claim are unavailing. For one, Plaintiff contends that his right to protection was violated insofar as Officer Devora, rather than stopping Garza from chasing him, joined in the chase, even after supposedly seeing Garza holding the firearm. (Dkt. No. 1 at 4; Dkt. No. 18 at 4-5). The law is clear, however, that a person is not subject to seizure—let alone arrest—while actively running from the police. *See California v. Hodari D.*, 499 U.S. 621, 625-29 (1991).

Plaintiff also contends that Officer Devora, consciously disregarding the risk posed by Garza, created a dangerous environment by physically seizing him, thus rendering Plaintiff unable to protect himself. (*See* Dkt. No. 18 at 3-9). This invokes what is known as the "state-created danger" theory, which serves as the basis for a failure-to-protect claim when the state affirmatively created or exacerbated a dangerous situation that led to a person's injury. *See Robinson v. Webster Cnty.*, 825 F. App'x 192, 195 (5th Cir. 2020) (per curiam) (citing *Kovacic*, 628 F.3d at 214). The theory involves two basic elements: (i) that the defendant used their authority to create a dangerous environment for the plaintiff; and (ii) that the defendant acted with deliberate indifference to the plight of the plaintiff. *See Covington Cnty.*, 675 F.3d at 865 (quoting *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 537-38 (5th Cir. 2003)) (quotations omitted). But even though several other circuits have adopted the state-created danger theory, the Fifth Circuit has repeatedly declined the opportunity to do so. *See Robinson*, 825 F. App'x at 195.

For these reasons, Plaintiff raises insufficient facts to show that he had a special relationship with Officer Devora or the City necessary to trigger the constitutional duty of protection, and the state-created danger theory is not an otherwise viable alternative upon which to base his claim for monetary relief under § 1983.

## V. CONCLUSION

### *Recommended Disposition*

After review of the briefing, the record, and the applicable law, the Magistrate Judge RECOMMENDS that the Motion to Dismiss (Dkt. No. 30) be GRANTED insofar as Plaintiff fails to state a claim absent any *Monell* allegations and sufficient allegations of a "special relationship" with Officer Devora or the City. The Magistrate Judge further RECOMMENDS that the City's Motion for Entry of Order Granting the Motion to Dismiss (Dkt. No. 35) be DENED AS MOOT. Accordingly, the Magistrate Judge further RECOMMENDS that this case be DISMISSED and that this case be closed.

### *Notice to the Parties*

Within fourteen (14) days after being served a copy of this report, a party may serve and file specific, written objections to the proposed recommendations. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). Failure to file written objections within fourteen (14) days after service shall bar an aggrieved party from de novo review by the District Court on an issue covered in this report and from appellate review of factual findings accepted or adopted by the District Court, except on grounds of plain error or manifest injustice.

### *Directive to Clerk of Court*

The Clerk of Court is DIRECTED to forward a copy of this document to the parties by any receipted means.

DONE at McAllen, Texas this 7th day of April 2022.

J. SCOTT HACKER
United States Magistrate Judge